Duane M. Swinton
Joel P. Hazel
WITHERSPOON, KELLEY,
DAVENPORT & TOOLE, P.S.
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA  99201-0300
(509) 624-5265

Attorneys for Media Representatives

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO
(HONORABLE EDWARD J. LODGE)

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-07-23-N-EJL |
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES OF MEDIA REPRESENTATIVES IN SUPPORT OF OPEN COURT PROCEEDINGS |
| vs. | |
| JOSEPH EDWARD DUNCAN, III, | |
| Defendant. | |

COME NOW *The Spokesman-Review*, The Associated Press, *The Idaho Statesman,* the

Idaho Press Club, Idaho Newspaper Foundation, Idahoans for Openness in Government, Idaho

Allied Dailies, Idaho State Broadcasters Association, Boise State Radio, KHQ-TV, KREM-TV,

KXLY-TV, KTVB-TV, KTRV-TV, KBCI-TV and KIVI-TV (hereinafter "media

representatives"), acting by and through their attorneys, Witherspoon, Kelley, Davenport &

Toole, P.S., and respectfully file the following Memorandum of Points and Authorities in

support of public access to all court proceedings to be conducted under the Federal Death

Penalty Act ("FDPA"), concerning the above-referenced matter.

1

I.      **Nature of Proceeding and Position of Media Representatives**

In a death-penalty case, a federal capital jury renders a decision on whether the death penalty will be imposed after determining the existence, or not, of all aggravating facts, statutory and non-statutory, and all mitigation evidence. 18 U.S.C. § 3593(c). In the case at bar, among the evidence likely to be considered by the jury in the bifurcated death-penalty proceedings the court has authorized are a videotape taken by Defendant Joseph Duncan of D.G., a minor whom Defendant has pled guilty to killing, and testimony of D.G.'s sister, S.G., whom Defendant has admitted to sexually abusing. Other witnesses may testify to this matter relating to the death of D.G. and the sexual abuse of S.G.

The Court has requested input from the media through media representative Betsy Russell concerning whether the public may be excluded from viewing the videotape when it is shown to the jury and whether the public may be excluded from the courtroom for the testimony of S.G. or potentially other witnesses.

Before the Court may order closure of any proceeding, it must determine that (1) there is a compelling reason for closure that outweighs the public's right of access under the First Amendment; (2) there is a substantiated probability that, in the absence of closure, the compelling interest would be harmed, and (3) there are no alternatives to closure that would adequately protect the compelling interest. The Court must make specific findings as to each of these elements. *Press Enterprise v. Superior Court of California*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). If the Court intends to close any court proceeding, "a notice to the public is required before a court may close court proceedings to which a qualified right of public access exists." *United States v. Biagon, supra*, 510 F.3d at 846.

2

Public access to the proceedings in this matter relating to potential imposition of the death sentence must be provided because this required test for closure cannot be satisfied.

Because of the importance of having public access to the courtroom concerning all death-penalty proceedings so that the public can fully comprehend how this unique judicial process works and how the various participants -- judge, jury, counsel, witnesses and defendant – perform their duties and conduct themselves concerning potential imposition of capital punishment, the media representatives urge that all court proceedings be open to the public.  In advocating for the right of public access, the media representatives do not assert that the media has any greater rights of access than the general public, but rather that media rights are co-extensive with that of the public in being able to observe and fully comprehend the potential imposition of the most severe punishment that government may impose on an individual.

## II.      Public Has a First Amendment Right of Access to Criminal Proceedings

The rule is well-established that the public has a qualified First Amendment right of access to criminal court proceedings. *Press Enterprise Company v. Superior Court of California*, 478 U.S. 1, 106 S. Ct.. 2735, 92 L.Ed.2d 1 (1986).  "The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." *Id.*, 106 S. Ct. at 2739.

The Ninth Circuit has followed the lead of the Supreme Court in recognizing this constitutionally based right of the public to attend open court proceedings.  *United States v. Biagon*, 510 F.3d 844 (9th Cir. 2007).

3

Even prior to the application of the First Amendment concerning public access to court proceedings, courts had determined that there was a common law right of access, based on the principle that the public needs to understand what goes on in courtrooms. For instance, the Supreme Court of Kentucky in 1980 held that closure of the courtroom for the testimony of ten male victims under the age of twelve in a case involving an allegation of sodomy was in violation of the public's common law right of access to trial proceedings. The court determined that the trial court's error in closing the courtroom was "apparent" because "public trials are highly favored in the commonwealth. The courtroom doors may be closed to the general public only on a rare occasion and only after determination that in no other way can justice be served." *Lexington Herald Leader Company v. Tackett,* 601 S.W.2d 905, 906 (Ky. 1980).[1]

---

[1] The Kentucky Supreme Court eloquently set out the basis for providing public access to trial proceedings. Quoting from an earlier decision of the Kentucky Supreme Court, Justice Lukowsky wrote:
The principle that justice cannot survive behind walls of silence is so deeply embedded in our Anglo-American judicial system so as to give our people in today's modern society a deep distrust of secret trials. One of the strongest demands of a democratic system is that the public should know what goes on in their courts. This demand can only be met by permitting them to be present in person and by permitting the press that has the facilities to properly inform them to be present upon their behalf. It is insisted by some the right to public trial is solely for the benefit of the criminal defendant and if he has no objection to a closed trial then the public should not be permitted to object. This contention overlooks the fact that the public is a party to all criminal proceedings. The proceeding is prosecuted in the name of the public. In our opinion there is nothing that better protects the rights of the public than their presence in proceedings where these rights are on trial. The news media should be accorded some priority in this respect for they have the facilities to disseminate the information of what transpires to a much broader audience than those that can gather in a crowded courtroom. [Citation omitted.]

The most important characteristics of the judiciary are integrity and credibility. Courtrooms are kept open not so that members of the public can expose wrongdoings; rather, they are open to all the citizens to see for themselves how their laws are impartially applied. It is to the benefit of a free society that judicial proceedings be publicly conducted. Not only are all citizens to be treated equally under the law – they must be able to see that they are equally treated in their courts.

The trial judge took cognizance of the delicate and distasteful matters about which the young witnesses were to testify and decided that they would suffer less embarrassment and emotional trauma if such testimony were given in a closed courtroom. We do not quarrel with his concern. The problem is, however, that by the very nature of certain trials, civil as well as criminal, this embarrassment and emotional strain commonly occur. One can think of instances in trials involving rape, incest, sodomy, criminal conversation, paternity, child abuse, seduction of a minor, loss of consortium, alienation of affection, divorce, child custody, fraud, etc., where the witnesses, child and adult alike, will be greatly embarrassed and traumatized by testifying publicly. Yet this embarrassment and trauma has not been deemed sufficient justification to bar 'a reasonable portion of the public' from these proceedings. [Citation

4

A.    **Public Right of Access to Criminal Proceedings Includes Plea and Sentencing Proceedings**

The public right of access to criminal proceedings includes public attendance at plea and sentencing proceedings. *U.S. v. Alcantara*, 396 F.3d 189 (2nd Cir. 2005); *In Re Washington Post Company*, 807 F.2d 383 (4th Cir. 1986). Holding that "under the First Amendment, the press and the public have a presumed right of access to court proceedings and documents", the Ninth Circuit has determined that there is a qualified right of access by the public to plea agreements. *Oregonian Publishing Company v. U.S. District Court for District of Washington*, 920 F.2d 1462, 1465 (9th Cir. 1990).

In analyzing whether a particular proceeding should be open to the public, the *Press Enterprise* decision, *supra,* directs courts to review both the tradition of openness and the role public access plays in the functioning of the particular process in question. 106 S. Ct. at 2740. Reviewing these two issues in the context of plea and sentencing proceedings, the court in *In Re Washington Post Company, supra,* determined:

> We know, first of all, that both plea hearings and sentencing hearings arguably fall within the scope of the right of access to criminal trials, which is clearly guaranteed by Richmond Newspapers and Globe Newspaper Company. Because the taking of a guilty plea serves as a substitute for a trial, it may reasonably be treated in the same manner as a trial for First Amendment purposes. Sentencing may also be viewed as within the scope of the criminal trial itself. Sentencing can occur before the termination of the trial proceeding, and, even if it occurs at a separate hearing, it clearly amounts to the culmination of the trial. Moreover, even if plea hearings and sentencing hearings are not considered a part of the trial itself, they are surely as much an integral part of a criminal prosecution as are preliminary

omitted.] Embarrassment and emotional trauma to witnesses simply do not permit a trial judge to close his courtroom to the entire public.

*Lexington Herald Leader Company, supra,* at 906-907.

probable-cause hearings, suppression hearings, or bail hearings, all of
which have been held to be subject to the public's First Amendment right of
access.

In addition, historical and functional considerations weigh in favor of
finding a First Amendment right of access here.  Sentencing has historically
been open to the public; while plea hearings do not have the same long
tradition, they are typically held in open court.  As to both, public access
serves the important function of discouraging either the prosecutor or the
court from engaging in arbitrary or wrongful conduct.  The presence of the
public operates to check any temptation that might be felt by either the
prosecutor or the court to obtain a plea guilty by coercion or trick, or to
seek or impose an arbitrary or disproportionate sentence.

807 F.2d at 389.

The same analysis is applicable to the proceedings at hand where the ultimate

determination will be whether the death penalty will be imposed on a criminal defendant.

Certainly, as the court indicated in *In Re Washington Post*, if a First Amendment right of access

exists as to preliminary probable-cause hearings, suppression hearings and bail hearings, the

public has an even greater need to have access to and comprehend how potential imposition of

the death penalty is handled by judges, juries, prosecutors and defense counsel involved in the

same.

**B.     Rarity and Significance of Death Penalty Cases Underscores Need for Public
Access to Proceedings Relating to Capital Punishment**

Federal death penalty cases are a rarity.  As of the spring of 2007, since the federal

government expanded in 1988 the matters for which the death penalty can be imposed, there had

been authorized only 420 prosecutions seeking the death penalty.  Of the 420 authorized

prosecutions, only 162 actually reached trial and sentencing.  In these, juries imposed 105 life

sentences and 57 death sentences.  *Marsha Coyle*, National Law Journal, April 30, 2007.  As of

the fall of 2007, the number of cases in which the Department of Justice sought capital

6

punishment was 431. This was out of 2,545 cases in which the crime alleged could have

resulted in imposition of the death sentence. *Pittsburg Post-Gazette*, October 28, 2007. Since

1988 only three persons have been executed under the federal death penalty statute, none in the

state of Idaho, and none of the prisoners on federal death row were convicted of crimes that

occurred in the state of Idaho. *Federal Death Penalty Resource Counsel Project*, June 20, 2006.

From these statistics, it is evident that, even with the expansion by Congress in 1988 of

federal crimes for which the death penalty can be imposed, the seeking and imposition of the

death penalty for a federal crime is an extremely rare occurrence, and one that has not been

imposed in the state of Idaho.

The procedures that are required concerning imposition of the death penalty under the

Federal Death Penalty Act recognize the rarity and severity of this potential punishment. The

two phases of analyzing whether the death penalty will be imposed—the eligibility phase and

the selection phase—ensure that the procedure "rationally narrow[s] the class of death-eligibility

defendants" and permit the jury to "render a reasoned, individualized sentencing determination

based on a death-eligible defendant's record, personal characteristics and the circumstances of

the crime." *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 24-25, 165 L.Ed.2d 429 (2006).

The Supreme Court has devised this two-phase procedure in recognition of the need for

heightened reliability in death penalty proceedings. *See Murray v. Giarratano*, 492 U.S. 1, 89,

109 S. Ct. 2765, 106 L.Ed.2d 1 (1989) (recognizing that "[t]he finality of the death penalty

requires a 'greater degree of reliability' when it is imposed") quoting *Lockett v. Ohio*, 438 U.S.

586, 604, 98 S. Ct. 2954, 57 L.Ed.2d 973 (1978).   The Supreme Court has recognized that "the

penalty of death is qualitatively different from all other forms of punishment". *Witson v. North

Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion).

Certainly, giving the extreme rarity and significance of proceedings under the Death Penalty Act, the public should have an opportunity to observe all matters that are considered by the court and the jury in determining whether the death penalty will be imposed. Public understanding of what occurs is heightened because of the unique nature of the proceedings and the requirement that a jury be impaneled, under a very detailed process, to determine whether the selection of punishment is that of the death penalty. Moreover, it cannot be disputed that the death penalty is still a controversial subject in this country, and, as a result, public understanding and opportunity to observe the procedures concerning how it may be imposed become even more important.

    **C.**     **Videotape and Testimony of S.G. and Other Witnesses are Key as to Imposition of the Death Penalty in the Case at Bar**

        **1.**     **Videotape and Witness Testimony Pertain to Whether Aggravating Circumstances Exist**

According to pleadings filed in this matter, the government will be seeking to introduce evidence of aggravating circumstances, which the defense has asserted must be shown in order to impose the death penalty. The aggravating circumstances cited by the government are impact on the victim and the victim's family, and the likelihood of the defendant to commit similar crimes in the future. The Death Penalty Act requires that the jury "consider all the information received during the hearing." 18 U.S.C. § 3593(d). Thus, the videotape of D.G. and testimony of S.G. and others <u>must</u> be considered by the jury in its death penalty deliberations. It should be noted, however, that the media representatives are not seeking to copy the videotape that is to be introduced into evidence. Rather, the media representatives assert that the media's right and that of the public is to attend all proceedings concerning imposition of the death penalty, including attendance at court when the videotape is shown to the jury.

8

  a.  **Videotape Relates to Impact on D.G. of his Treatment by**
     **Defendant**

  The general nature of the videotape has been described in previous state litigation and

discussions by law enforcement with the media as "graphic" concerning the treatment of D.G.

by the defendant.  The videotape directly relates to aggravating circumstances concerning

impact on the victim and impact on the victim's family as to how D.G. was treated by defendant,

and thus, will be a key part of the jury's analysis of aggravating circumstances.  As a result, not

only are the death penalty proceedings in general significant to the public in observing and

understanding the procedures as to potential imposition of the death penalty, but also the

videotape is a key part of the analysis that will occur as part of these proceedings.  Observation

of the videotape itself will allow the public to understand issues that may relate to aggravating

circumstances concerning imposition of the death penalty, will allow the public to fully

comprehend what evidence has been presented to the jury for consideration as to imposition of

the death penalty and will allow the public to observe the impact of playing the video on the trial

participants, including the jury, counsel and defendant.

  Courts have recognized both a common law and a constitutional right to access

videotapes that are introduced into evidence at trial.  *United States v. Meyers*, 635 F.2d 945 (2nd

Cir. 1980); *United States v. Criden*, 648 F.2d 814 (3rd Cir. 1981); see also, *United States v.*

*Moussaoui*, 34 Media L.Rep., 1545 (E.D.Va. 2006) (public release ordered by court of voice

recordings that were introduced during the sentencing phase of a convicted terrorist's criminal

trial).

  A similar issue was presented in the case of *Application of KSTP Television*, 504 F.Supp.

360 (D.C. Minn. 1980).  In that case, introduced as evidence at trial of a defendant accused of

kidnapping were videotapes that he had taken concerning his treatment of one of his kidnapping victims while she was held captive in his home. Two television stations in Minneapolis sought access to the tapes for the purpose of copying them, which the trial court denied. However, in denying the request to physically copy the tapes, the court noted that "the public has been fully informed by complete news coverage of the trial by all the media. The tapes were shown in the courtroom for all to see. Complete transcripts were furnished to the media. There is no question here of a truncated flow of information to the public." 504 F.Supp. at 362.

The tapes in the Minnesota case that were shown in an open courtroom and received into evidence recorded "conversations and conduct preliminary to, and anticipatory of, the actual sexual acts. The films showed the blindfolded victim lying on a blanket on the floor, her hands and feet bound." 504 F.Supp. at 361. In ruling that allowing the media to copy the tapes would serve little purpose, the court underscored that "the trial was open, the public and press were in daily attendance. The media was assured adequate seating, was able to view the tapes at trial and was given a transcript of them. All of the information on the tapes has been made available to the public." 504 F.Supp. at 363.

The media representatives request that, if the videotape of D.G. is introduced as evidence at the death penalty proceedings and shown to the jury, the courtroom be open to the public while the videotapes are shown to the jury.

> **b.    The Testimony of S.G. is also Integral to Consideration of Aggravating Circumstances as to Potential Imposition of the Death Penalty.**

Just as the videotape of D.G. may contain information that impacts the jury's consideration of aggravating circumstances, so will the testimony of S.G. Based on information previously released to the media by law enforcement and as part of the criminal proceedings in

Idaho state court, it is assumed that the testimony of S.G. will relate to defendant's abducting her and D.G. from their home, subsequent abuse of the two children by defendant, and potentially S.G.'s viewing of the death of D.G. This testimony will not be extraneous to that decision of whether aggravating circumstances exist, but rather will be critical. To exclude the public from observing the testimony would be to be exclude the public from what may be the key part of the death penalty proceedings.

Moreover, it is not only the testimony itself but how it is received in the courtroom that is critical to the public's understanding of this process. How S.G. conducts herself in the courtroom, how counsel, both prosecution and defense, conduct themselves concerning the examination of S.G., how the court handles the examination of S.G., and how the jury reacts to the testimony are all key elements as to the public's understanding of this critical part of the death penalty proceedings and cannot be duplicated by reviewing the words in a transcript of her testimony. If a transcript were sufficient to analyze this issue, then it would be the transcript that would be shown to the jury, and there is certainly no consideration in this case that the jury not be allowed to observe how S.G. testifies and how her testimony is handled by the Court and counsel for the prosecution and defendant.

**III.    Closure Will not Protect S.G.'s Privacy Where Her Identity and Her Sexual Abuse by Defendant have been Publicly Disclosed.**

As indicated previously, the analysis the Court must undertake to bar the public from any proceeding concerning this matter is that (1) closure serves a compelling interest, (2) there is a substantial probability that, in the absence of closure, the compelling interest would be harmed, and (3) there are no alternatives to closure that would adequately protect the compelling interest.

11

*Oregonian Publishing, supra*, at 920.  While privacy interests of a witness may be important, it

is difficult to comprehend, given the previous public disclosure, that a substantial probability of

damage to S.G.'s privacy rights would result where her identity has been previously publicly

disclosed, she has been photographed and interviewed by the media, and the general nature of

her sexual assault has also been made public.  When constitutional rights of the public are

impacted, courts may not enter orders restraining those rights where the orders cannot

accomplish what the orders are intended to protect.  *Nebraska Press Assoc. v. Stuart*, 427 U.S.

539, 96 S.Ct. 2791, 49 L.Ed. 2d 683 (1976).

### A.    Identities of S.G. and D.G. have been in Public Domain for Three Years

The names of S.G. and D.G. first became public on May 17, 2005, when law

enforcement officials in North Idaho issued an "Amber alert" concerning their disappearance

from their home near Coeur d'Alene, where the bodies of three other persons were discovered.

Subsequently, upon the apprehension of defendant, the name of S.G. continued to be publicly

disclosed and discussed as was that of D.G., when it was discovered that he had been murdered.

Their names have been mentioned in dozens of stories in the Spokesman-Review alone and have

also been reported by the Associated Press, and by television stations throughout the Inland

Northwest, among others.  Therefore, closing the courtroom will not protect the identity of S.G.

In fact, S.G. was interviewed on television on the occasion of what would have been the

birthday of one of her deceased brothers, whose body was found in the family residence in

Coeur d'Alene.  In the interview she also discussed her brother D.G.  Details of this event were

covered extensively by the Associated Press, the Spokesman-Review and the three television

stations in Spokane.  Moreover, S.G. has been interviewed by the national media, including on

the syndicated Geraldo Rivera program, and her interview with him can be accessed on Geraldo

12

Rivera's website.  S.G.'s father appeared on the Oprah Winfrey show to discuss the impact of these incidents on his family, including S.G.

   **B.**   **S.G.'s Sexual Abuse by Defendant has been Publicly Disclosed**

        The nature of defendant's treatment of both D.G. and S.G. has been publicly discussed by state law enforcement officials in North Idaho.  As a result, it has been publicly disclosed that S.G. was sexually assaulted by defendant, that she observed the death of her brother D.G., and that D.G. was abused by defendant prior to defendant killing D.G.

        As a result, closing the courtroom will not protect the privacy of S.G. concerning disclosure of the fact that she was assaulted by defendant and observed the killing of D.G. by defendant.  These facts, and the general nature of defendant's treatment of both D.G. and S.G., have already been publicly disclosed and have been widely disseminated not only in Northern Idaho and Eastern Washington but throughout the country.

   **C.**   **Closure of Courtroom to Public will not Protect S.G.'s Privacy because Courtroom Personnel and Jury would Still be Present for Her Testimony**

        Closing the courtroom to protect S.G. from having to relate to other persons the details of her treatment by defendant will not serve to protect that interest since it is likely that some two dozen people or more would be in the courtroom to observe S.G.'s testimony.  Thus, S.G. would still testify before the jury, the officiating judge, bailiffs, court reporter, counsel for the government, counsel for defendant, defendant himself, courtroom security personnel and potentially child advocate representatives in the courtroom.  It is not clear, as a result, how testifying perhaps before additional members of the public would create any different impact on her, particularly where she has already been interviewed on television and her identity is publicly known.

Thus, closing the courtroom would not protect S.G.'s identity or protect her from testifying before a large group of people, since her identity has already been publicly disclosed and there would be a large group of persons in the courtroom, even if the general public were barred.

**IV.     Less Restrictive Alternatives than Complete Closure of the Courtroom are Available.**

The Court has already taken one step to protect S.G. by barring cameras from the courtroom and courthouse.  In addition, prior to S.G.'s testimony, the Court could instruct those in the courtroom not to display any outward bursts of emotion as S.G. or other witnesses are testifying.  These are available less restrictive alternatives than closure of the courtroom to the public for protecting the emotional state of S.G. as she testifies.

If the issue is her testifying in an open courtroom with defendant or others present, the applicable federal statute -- 18 U.S.C. § 3509 -- concerning the rights of child victims and child witnesses, provides two less restrictive alternatives than complete closure of the courtroom:  (1) testimony by S.G. by live two-way closed circuit television, and (2) testimony by videotaped deposition.  18 U.S.C. § 3509(b).  In both situations, the testimony would be played in open court.[2]

The less restrictive alternative suggested by 18 U.S.C. § 3509(b) relating to use of two-way closed circuit television has been utilized in cases involving testimony by juveniles who were victims of sexual abuse.  In *United States v. Rouse*, 111 F.3d 561 (8th Cir. 1997), the court determined that testimony by closed circuit television by three alleged victims of sexual abuse –

---

[2]  Videotaped testimony of witnesses has also been considered where there is a concern over prejudicial outbursts of witnesses.  *United States v. Driscoll*, 203 F.Supp.2d 334 (MD Pa. 2002).

ages 7, 5 and 4 ½ -- was appropriate.  The district court decided on this alternative based on the court's questioning of each child in chambers to determine that they were emotionally unable to testify in open court.  The 8th Circuit Court ruled that, in invoking such a procedure, the district court must find that the child would be traumatized not only by the courtroom generally but also by the presence of the defendant.  111 F.3d at 568.

In the case of *United States v. Thunder*, 438 F.3d 866 (8th Cir. 2006), the court held that the testimony of 12-year old and 11-year old girls, who were sexually abused by defendant, was required to be held in open court.  In rejecting the government's argument that the courtroom should have been closed so as not to expose the two children to "voyeuristic or prurient interests," the court stated:

> We believe that this argument is untenable.  We have an open government, and secret trials are inimical to the spirit of a republic, especially when a citizen's liberty is at stake.  The public, in a way, is necessarily a party to every criminal case.  438 F.3d at 867.

Significantly, the 8th Circuit Court noted that "while the Supreme Court has held that the right of access to a criminal trial is 'not absolute,' [citations omitted], the court has never actually upheld the closure of a courtroom during a criminal trial or any part of it, or approved a decision to allow witnesses in such a trial to testify outside the public eye."  438 F.3d at 866.

The 8th Circuit Court stressed that public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the fact-finding process, with benefits to both the defendant and to society as a whole.  Citing the Supreme Court's decision in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the court stated that, "an open trial assures that proceedings are conducted fairly and discourages perjury, misconduct and decisions based on partiality or bias."  *Id.*, at 867.  The court noted that, even though most

15

community members do not attend trials, "the knowledge that they could and that others do fortifies the public's confidence in the trial's results." *Id.,* at 867. [3]

Thus, videotaped testimony and live 2-way closed circuit testimony by television, both sanctioned by statute, are less restrictive alternatives than barring the public entirely.

## CONCLUSION

Court proceedings relating to sentencing proceedings have traditionally been open to the public. In the case at bar, this openness serves the function of enabling public observation of the ultimate, and, at least in some circles, controversial, penalty that may be imposed – death of a defendant.

While there may be an interest in protecting privacy rights of juvenile sexual abuse victims, closure will not protect the identities of D.G. and S.G., whose names have already been publicly disclosed as have the general nature of the manner of death of D.G. and the sexual abuse of S.G.

---

[3] The public's right to observe execution proceedings has been upheld under the First Amendment. In *California First Amendment Coalition v. Woodford,* 299 F.3d 868 (9th Cir. 2002), the court struck down, as violative of the First Amendment, a California prison procedure which limited public access to executions based on the prison officials' interest in the safety of prison staff and identity of prison staff. The court determined that the viewing restrictions were too broad because they limited the public's ability to have firsthand knowledge of how a death penalty is imposed. In applying the test for closure of a criminal proceeding, as set out under *Press Enterprise, supra,* the court noted that the California prison rule was limiting because "the witnesses may not observe the condemned inmate's demeanor as he enters the execution chamber, has intravenous lines inserted into his body and realizes that the saline solution has begun to flow. The witnesses may not observe the manner of the guards as they restrain the prisoner... Because witnesses cannot see firsthand the manner in which the intravenous lines are injected, they will not be privy to any complications that may arise during this initial, invasive procedure. Consequently, the public will be forced to rely on the same prison officials who are responsible for administering the execution to disclose and provide information about any difficulties with the procedure... Procedure 770 thus entirely eliminates independent, public eyewitness observation of several crucial steps of the execution process." *Id.,* at 883. Certainly, if the First Amendment protects the public's right to observe the procedures behind imposition of the death penalty, it should also protect the public's right to fully comprehend the basis for deciding the death penalty will be imposed, by being able to attend all court proceedings in which evidence is presented to the jury making the death penalty decision.

Closing the courtroom during the testimony of S.G. or any other witness who might be embarrassed because of their testimony does not protect such witnesses from testifying before other individuals since the courtroom necessarily would remain open to the judge, jury, defense and prosecution counsel, bailiff, court reporter, court security personnel, child advocate representatives, and the defendant would still be present in the courtroom. As to the testimony of S.G., a less restrictive alternative exist in having her testify via two-way closed circuit television or by videotape.

Both the testimony of S.G. and the videotape concerning D.G. are key to the jury's determination and evaluation of aggravating circumstances concerning potential imposition of the death penalty. The media representatives seek only to see what is presented to the jury at the time it is presented and do not seek physical access to nor the right to copy the videotaped material.

There exists in this country a longstanding tradition of openness of all criminal trial proceedings. As the court indicated in *Press Enterprise, supra,* there is a "community therapeutic value" of openness. "Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. 'When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions.'" (Citations omitted.) 106 S.Ct. at 2742. That therapeutic value provided by open court proceedings is certainly a pre-eminent concern in this case.

The media representatives respectfully request that public access be provided to all court proceedings in which evidence is presented to the jury concerning potential imposition of the death penalty in the case at bar.

17

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT
    & TOOLE, P.S.


By: */s/ Joel P. Hazel*  _____
        DUANE M. SWINTON, WSBA #8354
        JOEL P. HAZEL, ISB # 4980
        Attorneys for Media Representatives

18

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that on the 15th day of April, 2008, I caused a true and correct copy of the MEMORANDUM OF POINTS AND AUTHORITIES OF MEDIA REPRESENTATIVES IN SUPPORT OF OPEN COURT PROCEEDINGS to be forwarded, with all required charges prepaid, by the method(s) indicated below, to the following party:

| Party | | Method |
|---|---|---|
| Judy Clarke<br>Federal Defender's Office<br>225 Broadway, Suite 900<br>San Diego, CA 92101 | ☒<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Via fax: (509) 624-7606 |
| Mark A. Larranaga<br>Walsh & Larranaga<br>705 Second Ave., #405<br>Seattle, WA 98104 | ☒<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Via fax: (206) 322-4305 |
| Roger Peven<br>Federal Defender's Office<br>10 N. Post St., #700<br>Spokane, WA 99210 | ☒<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Via fax: (509) 747-3539 |
| Thomas Monaghan<br>Federal Defender's Office<br>350 N. 9th St., Number 301<br>Boise, ID 83702 | ☒<br>☐<br>☐<br>☒ | U.S. Mail<br>Hand Delivered<br>Overnight Mail<br>Via fax: (208) 388-1757 |

/s/ Terry Erickson
TERRY ERICKSON, Legal Assistant

G:\C\Cowles 15835\Duncan\Memo of P&A 041108.doc

19